## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL GOTTLIEB, derivatively on behalf of LATCH, INC.,

      Plaintiff,

      v.

LUKE SCHOENFELDER, GARTH MITCHELL, BARRY SCHAEFFER, RAJU RISHI, J. ALLEN SMITH, PETER CAMPBELL, PATRICIA HAN, ROBERT J. SPEYER, and ANDREW SUGRUE,

      Defendants,

      and

LATCH, INC.,

      Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Daniel Gottlieb ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Latch, Inc. ("Latch" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Luke Schoenfelder ("Schoenfelder"), Garth Mitchell ("Mitchell"), Barry Schaeffer ("Schaeffer"), Raju Rishi ("Rishi"), J. Allen Smith ("Smith"), Peter Campbell ("Campbell"), Patricia Han ("Han"), Robert J. Speyer ("Speyer"), and Andrew Sugrue ("Sugrue") (collectively, the "Individual Defendants" and with Latch, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Latch, unjust

enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act and under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act.. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Latch, legal filings, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet and any documents filed with and publicly available from the securities fraud class actions in this Court, *Brennan v. Latch Inc., et al*, Case no. 1:23cv7473 and a securities fraud class action pending in the United States District Court District of Delaware captioned *Schwartz v. Latch, Inc., et al*, Case no. 1:23-cv-00027-UNA. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Latch's directors and officers from May 13, 2021, to August 25, 2022 (the "Relevant Period").

2.      Latch is a Delaware corporation based in New York that specializes in enterprise technology and offers a full-building operating system, LatchOS, to address the essential

requirements of modern buildings by offering modules for delivery and guest management, as well as smart homes and sensors.

3. On June 4, 2021, the Company was formed as a publicly-traded corporation through the merger (the "Merger") of Latch (formerly known as TS Innovation Acquisitions Corp. ("TSIA")), Latch Systems, Inc. ("Legacy Latch"), and Lionet Merger Sub Inc. ("Lionet Merger"). Lionet Merger was a Delaware corporation and wholly owned subsidiary of TSIA. Specifically, Lionet Merger merged with and into Legacy Latch, and Legacy Latch became the Company's wholly-owned subsidiary. Once the Merger was complete, the Company changed its corporate name from TS Innovation Acquisitions Corp. to Latch, Inc.

4. During the Relevant Period and leading up to the Merger, the Company touted its Revenue, Total Bookings, and Total Booked ARR and noted a trend of growth for these figures. Moreover, while the Company discussed in its SEC filings the hypothetical risk of material weaknesses in the Company's internal control over financial reporting causing material misstatements to the Company's financial statements, it did not reveal that this had already begun actively occurring, and therefore was an actualized rather than merely hypothetical concern. The Company also failed to disclose that, in relation to hardware devices, there were unreported sales arrangements, causing the Company to improperly recognize revenue. As a result of the material weaknesses in the Company's internal control over financial reporting related to revenue recognition, the Company would restate financial statements for fiscal 2021 and first quarter 2022.

5. On August 25, 2022, the Company disclosed that it would restate financial statements for 2021 and the first quarter of 2022 because there were revenue recognition errors related to hardware device sales.

3

6.      The Company revealed that "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures."

7.      On this news, the price per share of the Company's common stock fell $0.13, or 12.2%, to close on August 26, 2022, at $0.95.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while two of the Individual Defendants sold Company shares at inflated prices.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

4

11.    Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price was artificially inflated, resulting in the combined proceeds of over $500,000.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), and previous two Chief Financial Officers ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "New York Securities Class Action") and to a securities class action lawsuit pending in the United States District Court for the District of Delaware (the "Delaware Securities Class Action" and with the New York Securities Class Action, "Securities Class Actions"). The Securities Class Actions have further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and the Delaware Securities Class Action and of the former CEO's and CFOs' liability in the Securities Class Actions, of their not being disinterested and/or independent

5

directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.      Plaintiff is a current shareholder of Latch. Plaintiff has continuously held Latch common stock at all relevant times.

### Nominal Defendant

20.     Latch is a Delaware corporation with its principal executive offices at 508 West 26th Street, Suite 6G, New York, New York 10001. Latch's shares trade on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "LTCH."

**Defendant Schoenfelder**

21.     Defendant Schoenfelder was the CEO and Chairman of the Board of the Company. Defendant Schoenfelder stepped down on January 11, 2023. According to the Company's Schedule 14A filed with the SEC on April 28, 2022 (the "2022 Proxy Statement"), on May 13, 2021, the start of the Relevant Period, Defendant Schoenfelder beneficially owned about 5.97 million shares of the Company's common stock, which was about 4.0% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on May 13, 2021, the beginning of the Relevant Period, was $9.96, Defendant Schoenfelder owned about $59.5 million worth of Latch stock.  For the fiscal year ended December 31, 2021, Defendant Schoenfelder received $402,053 in compensation from the Company.  Defendant Schoenfelder's base salary for 2021 was $401,553. Defendant Schoenfelder received $500 in Other Compensation.

**Defendant Mitchell**

22.     Defendant Mitchell was the CFO of the Company from prior to the Merger until March 28, 2022. He served as Transitioning Chief Financial Officer until May 10, 2022. According to the 2022 Proxy Statement and insider trading disclosures available with the SEC ("insider trading records"), on May 13, 2021, the start of the Relevant Period, Defendant Mitchell beneficially owned 931,174 shares of the Company's common stock, which was less than 1% of the Company's issued and outstanding common stock.  Given the price per share of the Company's

7

common stock at the beginning of the Relevant Period, $9.96, Defendant Mitchell owned about $9.3 million worth of Latch stock.  For the fiscal year ended December 31, 2021, Defendant Mitchell received $5,400,571 in compensation from the Company, including $5,049,294 worth of stock options.  Defendant Mitchell's base salary for 2021 was $350,777.

23.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on August 25, 2022, Defendant Mitchell made the following sales of Company stock (and made no purchases of Company stock). On October 1, 2021, Defendant Mitchell sold 72,959 shares of Company stock for $0.68 per share and 13,455 shares of Company Stock for $11.21 per share. On January 1, 2022, Defendant Mitchell sold 13,537 shares of Company stock for $7.57 per share On February 28, 2022, Defendant Mitchell sold 60,799 shares of Company stock for $0.68 per share.

24.     Thus, in total, before the fraud was exposed, Defendant Mitchell sold 160,750 Company shares on inside information, for which he received $344,261.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Schaeffer**

25.     Defendant Schaeffer was the Interim CFO of the Company from March 28, 2022, until January 11, 2023. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on August 25, 2022, Defendant Schaeffer made the following sales of Company stock (and made no purchases of Company stock). On April 1, 2022, Defendant Schaeffer sold 3,355 shares of Company stock for $4.18 per share. On July 1, 2022, Defendant Schaeffer sold 9,626 shares of Company stock for

$1.14 per share. On August 2, 2022, Defendant Schaeffer sold 5,243 shares of Company stock for $1.10 per share.

26.     Thus, in total, before the fraud was exposed, Defendant Schaeffer sold 18,224 Company shares on inside information, for which he received $30,765.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

### Defendant Rishi

27.     Defendant Rishi is a Company director and is the Chair of the Compensation Committee and a member of the Audit Committee. Prior to the Merger, Defendant Rishi served on the Board of Directors of Legacy Latch for four years. Defendant Rishi is also a General Partner at RRE Ventures. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Rishi beneficially owned 38,777 shares of the Company's common stock, which was less than 1% of the Company's issued and outstanding common stock. Given the price per share of the Company's common stock at the beginning of the Relevant Period, $9.96, Rishi owned about $386,218 worth of Latch stock. For the fiscal year ended December 31, 2021, Defendant Rishi received $354,500 in compensation from the Company. This included $29,500 in cash and $325,000 worth of stock.

### Defendant Smith

28.     Defendant Smith is a Company director and is a member of the Audit Committee and Compensation Committee. Prior to the Merger, Defendant Smith served on the Board of Directors of Legacy Latch for two years. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Smith beneficially owned 151,440 shares of the Company's common stock, which was less than 1% of the Company's issued and outstanding common stock. Given the price

9

per share of the Company's common stock at the beginning of the Relevant Period, $9.96, Defendant Smith owned about $1.5 million worth of Latch stock. For the fiscal year ended December 31, 2021, Defendant Smith received $352,000 in compensation from the Company. This included $27,000 in cash and $325,000 worth of stock.

### Defendant Campbell

29.    Defendant Campbell is a Company director and is the Chair of the Audit Committee. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Campbell beneficially owned 38,262 shares of the Company's common stock, which was less than 1% of the Company's issued and outstanding common stock. Given the price per share of the Company's common stock at the beginning of the Relevant Period, $9.96, Defendant Campbell owned about $381,000 worth of Latch stock. For the fiscal year ended December 31, 2021, Defendant Campbell received $354,000 in compensation from the Company. This included $29,000 in cash and $325,000 worth of stock.

### Defendant Han

30.    Defendant Han is a Company director and is a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Han beneficially owned 36,864 shares of the Company's common stock, which was less than 1% of the Company's issued and outstanding common stock. Given the price per share of the Company's common stock at the beginning of the Relevant Period, $9.96, Defendant Han owned about $367,000 worth of Latch stock. For the fiscal year ended December 31, 2021, Defendant Han received $347,000 in compensation from the Company. This included $22,000 in cash and $325,000 worth of stock.

10

**Defendant Speyer**

31.     Defendant Speyer is a Company director. Defendant Speyer is also the President and CEO of Tishman Speyer Properties, L.P. ("Tishman Speyer"), a global real estate investment management firm. Additionally, Defendant Speyer serves as CEO and Chairman of Tishman Speyer Innovation Corp. II, a special purpose acquisition company. According to the 2022 Proxy Statement and insider trading records, a related entity, TS Innovation Acquisitions Sponsor, L.L.C. (the "Sponsor"), beneficially owned 8.5% (or 12,713,334 shares) of the Company's stock as of April 13, 2022. Thus, considered collectively with the Sponsor, Defendant Speyer beneficially owned 8.7% (or 12,962,185 shares) of the Company's common stock as of April 13, 2022. Given the price per share of the Company's common stock at the beginning of the Relevant Period, $9.96, Defendant Speyer, considered collectively with the Sponsor, owned about $129 million worth of Latch stock. For the fiscal year ended December 31, 2021, Defendant Speyer received $345,000 in compensation from the Company. This included $20,000 in cash and $325,000 worth of stock.

32.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on August 25, 2022, Defendant Speyer made the following sales of Company stock (and made no purchases of Company stock). On January 24, 2022, Defendant Speyer sold 54,408 shares of Company stock. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33.     On January 24, 2021, the Company, TSIA—controlled by Defendant Speyer; Lionet Merger – controlled by Defendant Speyer; and Defendant Schoenfelder—the Company's CEO and Chairman, entered into a merger agreement (the "Merger Agreement") pursuant to

11

which: (a) each director of the Company in office immediately prior to the effective time of the merger (the "Effective Time") shall cease to be a director immediately following the Effective Time (including by causing each such director to tender an irrevocable resignation as a director, effective as of the Effective Time); (b) each person set forth in Section 1.6 of the Company Disclosure Letter shall be appointed to the Board of Directors of the Company, effective as of immediately following the Effective Time, and, as of such time, shall be the only directors of the Surviving Company; and (3) each person appointed as a director of the Company pursuant to the preceding sentence shall remain in office as a director of the Company until his or her successor is elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the Surviving Company Certificate of Incorporation and the Surviving Company Bylaws.

### Defendant Sugrue

34.    Defendant Sugrue is a Company director and is the Chair of the Nominating and Corporate Governance Committee. Prior to the Merger, Defendant Sugrue served on the Board of Directors of Legacy Latch for two years. Defendant Sugrue is also a Founding Partner at Avenir Growth Capital ("Avenir Growth"), a private investment firm. According to the 2022 Proxy Statement, a related entity of Avenir Growth, Avenir Latch Investors, LLC ("Avenir Latch"), beneficially owned 14.9% (or 21,435,551 shares) of the Company's common stock as of April 13, 2022. Thus, considered collectively with Avenir Latch, Defendant Sugrue beneficially owned 15.0% (or 21,472,814 shares) of the Company's common stock as of April 13, 2022. Given the price per share of the Company's common stock at the beginning of the Relevant Period, $9.96, Defendant Sugrue, considered collectively with Avenir Latch, owned about $213.9 million worth

of Latch stock. For the fiscal year ended December 31, 2021, Defendant Sugrue received $349,000 in compensation from the Company. This included $24,000 in cash and $325,000 worth of stock.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers, directors, and/or fiduciaries of Latch and because of their ability to control the business and corporate affairs of Latch, the Individual Defendants owed Latch and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Latch in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Latch and its shareholders so as to benefit all shareholders equally.

36.     Each director and officer of the Company owes to Latch and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Latch, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Latch were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

13

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Latch, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Latch's Board at all relevant times.

40.    As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

41.    To discharge their duties, the officers and directors of Latch were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

14

controls of the Company. By virtue of such duties, the officers and directors of Latch were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Latch's own Code of Business Conduct and Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Latch conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Latch and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Latch's operations would comply with all applicable laws and Latch's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

15

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.     Each of the Individual Defendants further owed to Latch and the shareholders the duty of loyalty requiring that each favor Latch's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Latch and were at all times acting within the course and scope of such agency.

44.     Because of their advisory, executive, managerial, directorial, and controlling positions with Latch, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

45.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Latch.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

16

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

48. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Latch was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

17

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

50.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Latch, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

51.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

52.     The Code of Ethics provides, as to "Company Records," that "accurate and reliable records are crucial to [the Company's] business. . .. Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control."

53.     The Code of Ethics provides, as to "Conflicts of Interest," that:

A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively…. The Company requires that employees and directors disclose any situation that reasonably would be expected to give rise to a conflict of interest.

***All transactions that would give rise to a conflict of interest involving a director, executive officer or principal financial officer must be approved by the Audit Committee***, and any such approval will not be considered a waiver of this Code.

(Emphasis added.)

54.     The Code of Ethics provides, as to "Competition and Fair Dealing," that:

18

All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

55.    The Code of Ethics provides, as to "Corporate Opportunities," that:

As an employee or director of the Company, you have an obligation to advance the Company's interests when the opportunity to do so arises. If you discover or are presented with a business opportunity through the use of corporate property or information or because of your position with the Company, you should first present the business opportunity to the Company before pursuing the opportunity in your individual capacity. No employee or director may use corporate property, information or his or her position with the Company for personal gain while employed by us or, for a director, while serving on our Board of Directors.

56.    The Code of Ethics provides, as to "Compliance with Laws and Regulations," that:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets.

57.    The Code of Ethics provides, as to "Compliance with Insider Trading Laws," that:

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of

the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors.

58.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider sales, and unjust enrichment.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, avoid insider trading, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## LATCH'S CORPORATE GOVERNANCE

59.     Pursuant to the Company's Corporate Governance Guidelines (the "Corporate Guidelines"), the entire Board is subject to the corporate governance practices contained therein.

60.     The Corporate Guidelines require directors to "spend the time and effort necessary to properly discharge his or her responsibilities." The director responsibilities listed in the Corporate Guidelines include: (1) exercising their business judgment in good faith; (2) acting in what they reasonably believe to be in the best interest of all stockholders; (3) becoming and remaining well-informed about the Company's business and operations and general business and

economic trends affecting the Company; and (4) ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

61.    The Corporate Guidelines provide, as to "Board Access to Senior Management," that:

> The Board will have complete access to Company management in order to ensure that directors can ask any questions and receive all information necessary to perform their duties. Directors should exercise judgment to ensure that their contact with management does not distract managers from their jobs or disturb the business operations of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the Chief Executive Officer or the Chairman of the Board, or if neither is available or neither is appropriate, directly by the director. To the extent appropriate, such contact, if in writing, should be copied to the Chief Executive Officer of the Company.

62.    Latch's Board is well aware that any communications made by management are on behalf of the company and the Board itself. Indeed, the Corporate Guidelines provide, as to the "Interaction with Institutional Investors, the Press and Customers," that:

> The Board believes that management speaks for the Company. Each director should refer all inquiries from institutional investors, the press or customers regarding the Company's operations to management. Individual Board members may, from time to time at the request of management, meet or otherwise communicate with various constituencies that are involved with the Company. If comments from the Board are appropriate, they should, in most circumstances, come from the Chairman of the Board.

63.    In violation of the Corporate Guidelines, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider sales, and unjust enrichment.   In violation of the Corporate Guidelines, the Individual Defendants

21

consciously disregarded their duties to (1) exercise their business judgment in good faith; (2) act in what they reasonably believe to be in the best interest of all stockholders; (3) become and remain well-informed about the Company's business and operations and general business and economic trends affecting the Company; and (4) ensure that the business of the Company is conducted so as to further the long-term interests of its stockholders.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

64.    Latch is a Delaware corporation founded in 2014 and based in New York that specializes in enterprise technology and offers a full-building operating system, LatchOS, to address the essential requirements of modern buildings by offering modules for delivery and guest management, as well as smart homes and sensors.

65.    TSIA was a SPAC, which is a corporate vehicle commonly used to take a private entity public. When TSIA was formed it had no commercial operations, instead it held an initial public offering ("IPO") with the intent of using acquired funds to purchase a target company. In this instance, Legacy Latch was the target.

66.    On June 4, 2021, the merger between Legacy Latch and TSIA closed, and the Company, Latch Inc., was formed as a publicly traded corporation.

67.    As part of the merger, Latch received over $450 million in cash proceeds. Legacy Latch equity holders received aggregate considerations of $1 billion, all payable in the newly issued shares of TSIA common stock. Legacy Latch equity holders were expected to have roughly 64% of the newly formed Latch, Inc. common stock, traded publicly under the ticker symbol "LTCH".

68.     During the Relevant Period and leading up to the Merger, the Company touted its Revenue, Total Bookings, and Total Booked ARR and noted a trend of growth for these figures. Moreover, while the Company discussed in its SEC filings the hypothetical risk of material weaknesses in the Company's internal control over financial reporting causing material misstatements to the Company's financial statements, it did not reveal that this had already begun actively occurring, and therefore was an actualized rather than merely hypothetical concern. The Company also failed to disclose that, in relation to hardware devices, there were unreported sales arrangements, causing the Company to improperly recognize revenue. As a result of the material weaknesses in the Company's internal control over financial reporting related to revenue recognition, the Company determined that it would restate financial statements for fiscal 2021 and first quarter 2022.

**False and Misleading Statements**

***May 12, 2021 Registration Statement***

69.     On March 10, 2021, Latch (at the time named TSIA) filed a Form S-4 Registration Statement and Proxy/Prospectus with the SEC in anticipation of the Merger. Latch then filed amendments on March 30, 2021, May 3, 2021, May 10, 2021, and May 12, 2021 (collectively the "Pre-Merger Registration Statement" or "Registration Statement"). On May 12, 2021, the Pre-Merger Registration Statement was declared effective.

70.     Announced through the Pre-Merger Registration Statement was the 2021 merger agreement between TSI, through its subsidiary, and Legacy Latch. Per the agreement, "[Legacy] Latch equity holders will receive aggregate consideration of $1.0 billion, payable in newly issued shares of TSIA Class A common stock at a price of $10.00 per share. . . ."

23

71.     Further, the Registration Statement provided that the TSIA board of directors "unanimously approved the Merger Agreement and the transaction contemplated thereby and recommends that TSIA stockholders vote" in favor of the Merger and all related issuances. Likewise, Legacy Latch's board of directors provided the same unanimous approval and made the same "for" recommendation.

72.     Latch was described in the Pre-Registration Merger Statement as "an enterprise technology company focused on revolutionizing the way people experience spaces by making spaces better places to live, work, and visit."

73.     Additionally, it emphasized that Latch's sales strategy was "simple, repeatable, scalable, and unique." However, TSIA and Latch materially misrepresented the Company's sales revenue and bookings. The majority of the bookings and represented revenue relied on non-binding letters of intent ("LOIs"). While the Pre-Merger Registration Statement boasted the economic potential of these LOIs, these assertions were materially false and failed to mention the risk involved. In the section labeled "Company Overview," the Registration Statement describes LOIs as the following:

> Latch engages with customers early in their construction or renovation process, establishing latch as a technology advisor to the building. This not only enables us to provide more technology advice early in the development process, but ***it also creates high revenue visibility. Our customers sign letters of intent ("LOIs") specifying which software and devices they want to receive and on which dates. This approach leads to multi-year software contracts, direct feedback loops with our customers and their residents, local and regional market insights, and a full picture of the ever-changing demands of building operators. With a delivery timeline that can range from an average of six to eighteen months after signing the LOI, depending on the construction schedule,*** we continuously evolve our products and add new features between the time of signing of the LOI and the time of install.

24

74. With regards to Bookings, the Registration Statement states, in the section addressing Key Business Metrics, the following, in relevant part:

> We use Bookings to measure sales volume and velocity of our hardware and software products. ***Bookings represent written but non-binding LOIs from our customers to purchase Latch hardware products and software services, not reflecting discounts***. We sell software services with all our access hardware products. ***Based on historical experience, we believe there is sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target delivery date no longer than 24 months following LOI signature.***

75. When discussing Booked Annual Recurring Revenue, the Pre-Merger Registration Statement touts an even shorter time frame for LOIs states an even shorter time frame for realizing LOIs stating:

> We use Booked Annual Recurring Revenue ("ARR") to assess the general health and trajectory of our recurring software. Booked ARR is defined as the cumulative value of annual recurring revenue from Latch software subscriptions that are under a signed LOI. We calculate Booked ARR by multiplying the total number of units that have been booked by the annual listed subscription pricing (excluding discounts) at the time of booking. ***LOIs typically deliver within 6 to 18 months of signing, depending on construction timelines.*** Booked ARR is adjusted for bookings that do not ship within a normal construction time-frame. It should be viewed differently from Software Booking as it represents only the average annual software revenue, not the lifetime contract value.

76. This representation of the Bookings, however, were material and false. LOIs functioned as an option to lock in a price and quantity but without an express agreement to purchase or a guarantee to make a payment. While the LOIs did exist, the Registration Statement vastly overstated the likelihood of converting an LOI to revenue. The reality showed that the LOI conversion rate was as low as 25-40%.

77. A common issue with converting an LOI into a sale was retrofitting older buildings to work with Latch devices. For example, a client who owns multiple buildings may sign an LOI

to have Latch devices installed into five of them. But when installation actually began to occur, the client's older buildings would often have major structural issues that prevented the installation of Latch devices, thereby the actual sale to the client fell short of the reported expected income from the LOI.

78.    Yet, in the face of this reality, the Pre-Merger Registration Statement stated that Latch continued to expect retrofit opportunities to significantly increase, stating, in relevant part:

> Currently we primarily serve the rental homes markets in North America. Based on internal research and external reporting, we estimate there are approximately 32 million multifamily apartment home units in North America. ***Today we primarily serve new construction and retrofit buildings. Since our launch in 2017, we have seen the share of our business coming from retrofit opportunities increase significantly: a trend we expect to continue over the medium term.*** We also serve the single-family market through our existing relationships with large real estate developers and owners. Based on internal research and external reporting, we estimate there are 15 million single-family rental home units in North America.

(Emphasis added.)

79.    There was, however, no warning in the Pre-Merger Registration Statement about the risk posed by Latch device installations being infeasible in older buildings.

80.    Likewise, the Pre-Merger Registration Statement noted that LOIs did not include sales discounts. Upon information and belief, however, the average discount customers received floated over 20% in February 2021. Therefore, relying on the LOIs as the basis for Latch's sales dramatically artificially inflated sales numbers by excluding customer discounts.

***The Company materially inflated hardware sales by providing early delivery***

81.    Regarding hardware sales, the Pre-Merger Registration statement made the following statements, in relevant part:

*Hardware Revenue*

26

We generate hardware revenue primarily from the sale of our portfolio of devices both first-party and third-party for our smart access and smart building solutions. We sell hardware to building developers through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer. The Company provides warranties related to the intended functionality of the products and those warranties typically allow for the return of defective hardware up to one year for electrical components and five years for mechanical components past the date of sale. We are currently in the process of developing and manufacturing our new generation of hardware products with much lower production costs which we expect will improve our future hardware margins.

\*   \*   \*

We currently generate revenue primarily from two sources, hardware devices and software products. ***Revenue is recognized upon transfer of control of promised goods or services to customers at transaction price.*** The Company estimates the transaction price, including variable consideration, at the commencement of the contract and recognizes revenue over the contract term.

(Emphasis added.)

82.     In order to "recognize revenue" earlier, Latch created a system to materially manipulate hardware sales number. The Company would recognize revenue based on shipments of product by quarter. In situations where Latch was failing to meet managements' desired quotas, employees were instructed to prematurely ship products to customers so that revenue could be recognized earlier.

### Smart Home Technology

83.     Legacy Latch often boasted about its "Smart Home" integration software. Latch reported that the software was the driver of a $0.8 million increase in hardware revenue for the second half of 2020.

84.     The Pre-Merger Registration Statement noted that Latch's Smart Home technology was a favorable factor for TSIA's board of directors to support the merger with Legacy Latch:

27

*Large and Expanding Growth Industry.* Latch primarily serves the rental home market in North America, which comprises approximately 32 million multifamily apartment home units and 15 million single-family home units in North America. **Latch is well positioned to take advantage of the growth in the smart home market, as well as to pursue other opportunities in adjacent segments, including expansion into the commercial office segment.**

*Attractive Business Model with Recurring Revenue Stream.* **Latch provides a full-service smart home ecosystem for customers. Its integrated product, which delivers a building software solution delivered through Latch hardware, allows for significant customer retention through long-term contracts, which generate high quality, long-term recurring software revenues.** The TSIA board also considered the fact that approximately 56% of Latch's 2020 Total Bookings was generated through its software, and that Latch has experienced 520% software bookings growth since 2018.

(Emphasis added.)

85.    In a section titled Company Overview, Latch touted its vision for Smart Home tech, stating:

After Latch has been installed and set up at a building, the building managers add all their residents as users to the Latch system. Our mobile applications then enable the residents to unlock all connected spaces in Latch buildings from the front door, package rooms, common spaces, elevators, and garages to their unit entrance, control their thermostat and smart home devices from the app, see who rang the bell at the front door through the intercom and let guests in through the app. In the near future, we believe interacting with services, buying renters insurance or choosing their internet package will all be possible from the Latch App. Residents become highly engaged users across all the capabilities that Latch provides them in their spaces.

86.    Latch, however, was materially misrepresenting the success and value of its Smart Home Technology segment. The Smart Home technology was hardly function. Yet, Latch continued to include Smart Home technology in LOIs. No clients could serve as references for the Smart Home technology.

**Booked Home Units---Cumulative**

28

87.     Latch, upon information and belief, also inflated the numbers presented for "Booked Home Units---Cumulative." The Pre-Merger Registration statement states the following, in relevant part:

> We use Booked Home Units---Cumulative to measure the number of homes signed to operate on our platform, market penetration in the rental homes market, and the size opportunity to grow revenue from increasing sales of additional hardware, software, and service revenue into signed homes. Booked Home Units represent the total number of apartment units or similar dwellings installed cumulatively, as well as committed to be installed, with Latch Products. Booked Home Units are adjusted for bookings that do not ship within a normal construction time-frame. LOIs typically deliver within 6 to 18 months of signing, depending on construction timelines.

88.     TSIA and Latch materially misrepresented the Booked Home Units because the units presented a two-fold problem. First, the Company would count units as growth opportunities without regard to the fact that many would never be compatible with Latch devices. Second, even if some units were generally compatible, many of the devices Latch promised for growth did not exist and lacked a proof of concept.

### International Expansion

89.     Moreover, the Pre-Registration Statement represented that Latch was in a prime position to quickly expand its international reach:

> Today, we only operate in the United States and Canada. While these geographies present sizeable opportunities for Latch, our solution set is well-positioned to enter new geographic markets such as Europe. We see a near-term opportunity to expand into France, Germany, and the United Kingdom with the support of Tishman Speyer and current customers as our anchor partners in these regions.

90.     Latch made material misrepresentations of its ability to expand into foreign markets. While touting both a future in Canada and Europe, at the time of publication none of Latch's products were available in any language other than English. Aside from a market such as

29

the United Kingdom, this limitation presents substantial hurdles to expanding Latch internationally.

91.    As such, the Pre-Merger Registration Statement was materially false and misleading because: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *May 13, 2021 Prospectus / Proxy Statement*

92.    On May 13, 2021, the Company filed a prospectus / proxy statement with the SEC on Form 424B3 (the "Prospectus"). The Prospectus stated that Latch's internal control over financial reporting contained the following material weaknesses:

> Latch has identified material weaknesses in its internal control over financial reporting that Latch is currently working to remediate, which relate to: (a) Latch's general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.

*    *    *

> If not remediated, these material weaknesses could result in material misstatements to Latch's annual or interim consolidated financial statements that might not be prevented or detected on a timely basis, or in delayed filing of required periodic reports.

93.     The Prospectus framed risks from these material weaknesses in internal control over financial reporting as potential rather than actualized, stating: "If not remediated, these material weaknesses *could* result in *material misstatements to Latch's annual or interim consolidated financial statements* that *might not be prevented* or detected on a timely basis, or in delayed filing of required periodic reports." (Emphasis added.)

94.     The Prospectus stated, regarding the Company's revenue recognition policy for hardware, that:

> *Hardware Revenue*
> We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart building solutions. We sell hardware to building developers through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer.

95.     The statements in paragraphs ¶¶ 92-94 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. Additionally, the statements in the Prospectus/Proxy Statement did nothing to remedy the false and misleading statements that were in the Pre-Merger Registration Statement. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

31

***June 9, 2021, Press Release***

96.      On June 9, 2021, the Company announced its financial results for the first fiscal quarter ended March 31, 2021, disclosing that Revenue was up 143% year-over-year, Booked ARR was up 120% year-over-year, and Total Bookings were up 89% year-over-year, and provided the following chart:

$ in thousands

|  | Three months ended March 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | $ Change | % Change |
| Revenue | $6,629 | $2,726 | $3,903 | 143% |
| Cost of revenue (1) | $6,162 | $3,262 | $2,900 | 89% |
| Operating expenses (1) | $31,714 | $15,345 | $16,369 | 107% |
| Other expenses (2) | $6,854 | $60 | $6,794 | NM |
| GAAP net loss | $(38,101) | $(15,941) | $(22,160) | (139%) |

NM: Not meaningful

97.      During an earnings conference call with investors and analysts to discuss the first quarter 2021 results, Defendant Schoenfelder stated that these results were "strong," acknowledging that they "demonstrate the increasing market demand for [Latch's] industry leading products."[1] Defendant Schoenfelder also disclosed that, as a result of the Merger, Latch "now [had] a stronger balance sheet and additional capital."[2] Defendant Schoenfelder did not

---

[1] https://investors.latch.com/news-releases/news-release-details/latch-reports-first-quarter-2021-financial-results
[2] *Id.*

discuss the Company's unreported sales arrangements related to hardware devices or the fact that these arrangements caused the Company to improperly recognize revenue.

*June 25, 2021, Registration Statement*

98.    On June 25, 2021, the Company filed a registration statement with the SEC on Form S-1 (the "Registration Statement"). The Registration Statement incorporated the Prospectus and repeated its false and misleading statements. The Registration Statement was signed by Defendants Schoenfelder, Mitchell, Speyer, Campbell, Han, Rishi, Smith, and Sugrue. The Registration Statement stated the following regarding Latch's internal control over financial reporting:

> We have identified material weaknesses in our internal control over financial reporting that we are currently working to remediate, which relate to: (a) our general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.

> Our management has concluded that these material weaknesses in our internal control over financial reporting were due to the fact that we were a private company with limited resources and did not have the necessary business processes and related internal controls formally designed and implemented coupled with the appropriate resources with the appropriate level of experience and technical expertise to oversee our business processes and controls.

> Our management is in the process of developing a remediation plan. The material weaknesses will be considered remediated when our management designs and implements effective controls that operate for a sufficient period of time and our management has concluded, through testing, that these controls are effective. Our management will continue to monitor the effectiveness of our remediation plans and will make the changes we determine to be appropriate.

> If not remediated, these material weaknesses could result in material misstatements to our annual or interim consolidated financial statements that might not be prevented or detected on a timely basis, or in the delayed filing of required periodic reports.

99.    The Registration Statement framed risks from these material weaknesses in internal control over financial reporting as potential rather than actualized, stating: "If not remediated, these material weaknesses **could** result in **material misstatements to [Latch's] annual or interim consolidated financial statements** that **might not** be prevented or detected on a timely basis, or in the delayed filing of required periodic reports." (Emphasis added.)

100.    The Registration Statement stated, regarding the Company's revenue recognition policy for hardware, that:

> *Hardware Revenue*
> We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart building solutions.
>
> *         *         *
>
> We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer.

101.    The Registration Statement did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

102.    The statements in paragraphs ¶¶ 99-101 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements

about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***July 7, 2021, Registration Statement***

103.    On July 7, 2021, the Company filed an amended Registration Statement with the SEC on Form S-1/A that substantially repeated some of the false and misleading statements contained in the Prospectus and the original Registration Statement. It was signed by, or on behalf of, Defendants Schoenfelder, Mitchell, Speyer, Campbell, Han, Rishi, Smith, and Sugrue. The amended Registration Statement stated the following regarding Latch's internal control over financial reporting:

> We have identified material weaknesses in our internal control over financial reporting that we are currently working to remediate, which relate to: (a) our general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.

*        *        *

> Our management is in the process of developing a remediation plan. The material weaknesses will be considered remediated when our management designs and implements effective controls that operate for a sufficient period of time and our management has concluded, through testing, that these controls are effective. Our management will continue to monitor the effectiveness of our remediation plans and will make the changes we determine to be appropriate.

> If not remediated, these material weaknesses could result in material misstatements to our annual or interim consolidated financial statements that might not be prevented or detected on a timely basis, or in the delayed filing of required periodic reports.

104.    The amended Registration Statement framed risks from these material weaknesses in internal control over financial reporting as potential rather than actualized, stating: "If not remediated, these material weaknesses ***could*** result in ***material misstatements to Latch's annual***

*or interim consolidated financial statements* that *might not* be prevented or detected on a timely basis, or in delayed filing of required periodic reports." (Emphasis added.)

105.    The amended Registration Statement stated, regarding the Company's revenue recognition policy for hardware, that:

*Hardware Revenue*

We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart building solutions. We sell hardware to building developers through our channel partners who act as the intermediary and installer.

*     *     *

We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer.

106.    The amended Registration Statement did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

107.    The statements in paragraphs ¶¶ 103-106 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

36

*July 12, 2021, Second Prospectus*

108.    On July 12, 2021, the Company filed another prospectus with the SEC on Form 424b3 (the "Second Prospectus") that repeated some of the false and misleading statements contained in the Prospectus and the original and amended Registration Statements. The Second Prospectus stated the following regarding Latch's internal control over financial reporting:

> We have identified material weaknesses in our internal control over financial reporting that we are currently working to remediate, which relate to: (a) our general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.

*    *    *

> Our management is in the process of developing a remediation plan. The material weaknesses will be considered remediated when our management designs and implements effective controls that operate for a sufficient period of time and our management has concluded, through testing, that these controls are effective. Our management will continue to monitor the effectiveness of our remediation plans and will make the changes we determine to be appropriate.

> If not remediated, these material weaknesses could result in material misstatements to our annual or interim consolidated financial statements that might not be prevented or detected on a timely basis, or in the delayed filing of required periodic reports.

109.    The Second Prospectus framed risks from these material weaknesses in internal control over financial reporting as potential rather than actualized, stating: "If not remediated, these material weaknesses *could* result in *material misstatements to Latch's annual or interim consolidated financial statements* that *might not* be prevented or detected on a timely basis, or in delayed filing of required periodic reports." (Emphasis added.)

110.    The Second Prospectus stated, regarding the Company's revenue recognition policy for hardware, that:

*Hardware Revenue*

We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart building solutions.

\*     \*     \*

We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer.

111. The Second Prospectus did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

112. The statements in paragraphs ¶¶ 109-111 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *August 12, 2021 Press Release*

113. On August 12, 2021, the Company announced its financial results for the fiscal quarter ended June 30, 2021, disclosing that Revenue was up 227% year-over-year, Booked ARR

38

was up 122% year-over-year, and Total Bookings were up 102% year-over-year, and provided the following chart:

*$ in thousands (unaudited)*

| | Three months ended June 30, | | $ Change | % Change |
|---|---|---|---|---|
| | 2021 | 2020 | | |
| Revenue | $ 9,012 | $ 2,752 | $ 6,260 | 227% |
| Cost of revenue | $ 8,242 | $ 3,239 | $ 5,003 | 154% |
| Operating expenses | $ 22,726 | $ 14,082 | $ 8,644 | 61% |
| Other expenses (1) | $ 18,105 | $ 417 | $ 17,688 | NM |
| GAAP net loss | $ (40,071) | $ (14,986) | $ (25,085) | (167%) |

114.    During an earnings conference call with investors and analysts to discuss these results, Defendant Schoenfelder stated that "Latch continues to see powerful demand for [its] products that drove a sharp acceleration in Total Bookings and Revenue growth in the first half of the year."[3] Furthermore, Defendant Schoenfelder declared that the second quarter 2021 financial results "underscore the increasing needs within the market for [Latch's] industry leading software, product ecosystem, and the tangible value they create for [Latch's] customers."[4]

*August 13, 2021, Form 10-Q*

115.    The following day, August 13, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2021 (the "2Q 2021 10-Q"), which was signed by Defendants Schoenfelder and Mitchell.

---

[3] https://investors.latch.com/news-releases/news-release-details/latch-reports-second-quarter-2021-financial-results
[4] *Id.*

116.     Attached to the 2Q 2021 10-Q were certifications pursuant to Rule 13a-14(a) and

15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants Schoenfelder and Mitchell attesting to the accuracy of the 2Q 2021 10-Q.

117.     The 2Q 2021 10-Q stated the following regarding Latch's internal control over

financial reporting:

> Management identified material weaknesses in our internal control over financial
> reporting for the periods ended December 31, 2020, and 2019. The material
> weaknesses, which we are currently working to remediate, relate to: (a) general
> segregation of duties, including the review and approval of journal entries; (b) lack
> of a formalized risk assessment process; and (c) selection and development of
> control activities, including over information technology.
>
> *     *     *
>
> We are in the process of implementing remediation efforts, including the hiring of
> additional financial employees and consultants with the appropriate public
> company and technical accounting expertise, and other actions described below. As
> such remediation efforts are still ongoing, we have concluded that the material
> weaknesses have not been fully remediated. Remediation efforts to date include the
> following:
>
> •We made an assessment of the accounting personnel and strengthened our
> compliance and accounting functions with additional experienced hires to assist in
> our risk assessment process and the design and implementation of controls.
> •We engaged external consultants with public company and technical accounting
> experience to facilitate accurate and timely accounting closes and to accurately
> prepare and review the financial statements and related footnote disclosures, prior
> to the hiring of internal resources. We plan to retain these financial consultants, as
> needed, until such time that the required financial controls have been fully
> implemented.
>
> *     *     *
>
> Notwithstanding the assessment that our internal controls over financial reporting
> are not effective and that material weaknesses exist, we believe that we have
> employed supplementary procedures to ensure that the financial statements
> contained in this filing fairly present our financial position, results of operations
> and cash flows for the reporting periods covered herein in all material respects.

118.    The 2Q 2021 10-Q downplayed the risks associated with these material weaknesses in internal control over financial reporting, stating that: "Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, *we believe that we have employed supplementary procedures to ensure that the financial statements contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects*." (Emphasis added.)

119.    The Company also revealed that, because of the previously disclosed material weaknesses, the Company's "disclosure controls and procedures were not effective."[5]

120.    The 2Q 2021 10-Q stated, regarding the Company's revenue recognition policy for hardware, that:

*Hardware and other related*

The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions.

\*        \*        \*

The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

121.    The 2Q 2021 10-Q did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

122.    The statements in paragraphs ¶¶ 116-120 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and

---

[5] https://investors.latch.com/node/7041/html

prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *August 24, 2021 Prospectus Supplement*

123.     On August 24, 2021, the Company filed a prospectus supplement with the SEC on Form 424b3 (the "Supplement") that contained false and misleading statements. The Supplement stated the following regarding Latch's internal control over financial reporting:

> Management identified material weaknesses in our internal control over financial reporting for the periods ended December 31, 2020 and 2019. The material weaknesses, which we are currently working to remediate, relate to: (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.
>
> \*         \*         \*
>
> We are in the process of implementing remediation efforts, including the hiring of additional financial employees and consultants with the appropriate public company and technical accounting expertise, and other actions described below. As such remediation efforts are still ongoing, we have concluded that the material weaknesses have not been fully remediated. Remediation efforts to date include the following:
>
> • We made an assessment of the accounting personnel and strengthened our compliance and accounting functions with additional experienced hires to assist in our risk assessment process and the design and implementation of controls.

• We engaged external consultants with public company and technical accounting experience to facilitate accurate and timely accounting closes and to accurately prepare and review the financial statements and related footnote disclosures, prior to the hiring of internal resources. We plan to retain these financial consultants, as needed, until such time that the required financial controls have been fully implemented.

\*     \*     \*

Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, we believe that we have employed supplementary procedures to ensure that the financial statements contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects.

124. The Supplement downplayed the risks associated with these material weaknesses in internal control over financial reporting, stating that: "Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, **we believe that we have employed supplementary procedures to ensure that the financial statements contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects**." (Emphasis added.)

125. The Supplement stated, regarding the Company's revenue recognition policy for hardware, that:

*Hardware and other related*

The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions.

\*     \*     \*

The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

126.    The Supplement did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

127.    The above statements identified in ¶¶ 123-126 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 9, 2021 Press Release*

128.    On November 9, 2021, the Company announced its financial results for the fiscal quarter ended September 30, 2021, in the following chart:

*$ in thousands (unaudited)*

| | Three months ended September 30, | | $ Change | % Change |
|---|---|---|---|---|
| | 2021 | 2020 | | |
| Revenue | $ 11,197 | $ 5,095 | $ 6,102 | 120% |
| Cost of revenue | $ 11,153 | $ 5,890 | $ 5,263 | 89% |
| Operating expenses | $ 34,391 | $ 14,657 | $ 19,734 | 135% |
| Other income (expense) (1) | $ 108 | $ (422) | $ 530 | 126% |
| GAAP net loss | $ (34,239) | $ (15,874) | $ (18,365) | (116%) |

129.    During an earnings conference call with investors and analysts to discuss these results, Defendant Schoenfelder represented that it was "another record quarter for Latch, with 120% revenue growth year-over-year."[6] Defendant Schoenfelder stated that these results reflect "[Latch's] vast market opportunity and the fierce industry demand for [Latch's] products."[7]

### *November 10, 2021 Form 10-Q*

130.    On November 10, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 (the "3Q 2021 10-Q"), which was signed by Defendants Schoenfelder and Mitchell. The Company also revealed that, because of the previously disclosed material weaknesses, the Company's "disclosure controls and procedures were not effective."[8]

---

[6] https://investors.latch.com/news-releases/news-release-details/latch-reports-third-quarter-2021-financial-results
[7] *Id.*
[8] https://investors.latch.com/node/7191/html#i663e24ca2ba7427d9dc9852eebe43310_163

131.   Attached to the 3Q 2021 10-Q were certifications pursuant to Rule 13a-fidu and 15d-14(a) under the Exchange Act and SOX signed by Defendants Schoenfelder and Mitchell attesting to the accuracy of the 3Q 2021 10-Q.

132.   The 3Q 2021 10-Q stated the following regarding Latch's internal control over financial reporting:

> Management identified material weaknesses in our internal control over financial reporting for the periods ended December 31, 2020 and 2019. The material weaknesses, which we are currently working to remediate, relate to: (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.
>
> *       *       *
>
> We are in the process of implementing remediation efforts as described below. As such remediation efforts are still ongoing, we have concluded that the material weaknesses have not been fully remediated. Remediation efforts to date include the following:
>
> •We made an assessment of the accounting personnel and strengthened our compliance and accounting functions with additional experienced hires to address evaluation of technical accounting matters and general segregation of duties.
>
> •We performed a formalized financial and fraud risk assessment; and subsequently selected and designed internal control activities, including over information technology. Control activities are undergoing testing by management to assess effectiveness.
>
> •We continue to be engaged with external consultants with public company and technical accounting experience to facilitate accurate and timely accounting closes and to accurately prepare and review the financial statements and related footnote disclosures. We plan to retain these financial consultants, as needed, until such time that the required financial controls have been fully implemented.
>
> *       *       *
>
> Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, we believe that we have employed supplementary procedures to ensure that the financial statements

contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects.

133. The 3Q 2021 10-Q downplayed the risks associated with these material weaknesses in internal control over financial reporting, stating that: "Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, *we believe that we have employed supplementary procedures to ensure that the financial statements contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects*." (Emphasis added.)

134. The 3Q 2021 10-Q stated, regarding the Company's revenue recognition policy for hardware, that:

*Hardware and other related*

The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions.

\*     \*     \*

The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

135. The 3Q 2021 10-Q did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

136. The statements in paragraphs ¶¶ 132-135 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal

47

2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***November 10, 2021 Prospectus Supplement***

137.    On November 10, 2021, the Company filed a second prospectus supplement with the SEC on Form 424b3 (the "Second Supplement") that contained false and misleading statements. The Second Supplement stated the following regarding Latch's internal control over financial reporting:

> Management identified material weaknesses in our internal control over financial reporting for the periods ended December 31, 2020 and 2019. The material weaknesses, which we are currently working to remediate, relate to: (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.
>
> *    *    *
>
> We are in the process of implementing remediation efforts as described below. As such remediation efforts are still ongoing, we have concluded that the material weaknesses have not been fully remediated. Remediation efforts to date include the following:
>
> •We made an assessment of the accounting personnel and strengthened our compliance and accounting functions with additional experienced hires to address evaluation of technical accounting matters and general segregation of duties.
>
> •We performed a formalized financial and fraud risk assessment; and subsequently selected and designed internal control activities, including over information technology. Control activities are undergoing testing by management to assess effectiveness.

•We continue to be engaged with external consultants with public company and technical accounting experience to facilitate accurate and timely accounting closes and to accurately prepare and review the financial statements and related footnote disclosures. We plan to retain these financial consultants, as needed, until such time that the required financial controls have been fully implemented.

\*        \*        \*

Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, we believe that we have employed supplementary procedures to ensure that the financial statements contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects.

138.    The Second Supplement downplayed the risks associated with these material weaknesses in internal control over financial reporting, stating that: "Notwithstanding the assessment that our internal controls over financial reporting are not effective and that material weaknesses exist, *we believe that we have employed supplementary procedures to ensure that the financial statements contained in this filing fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects*." (Emphasis added.)

139.    The Second Supplement stated, regarding the Company's revenue recognition policy for hardware, that:

*Hardware and other related*

The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions.

\*        \*        \*

The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

49

140.    The Second Supplement did not discuss that there were unreported sales arrangements related to hardware devices and that, as a result, the Company had improperly recognized revenue.

141.    The above statements identified in ¶¶ 137-141 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *February 24, 2022 Press Release*

142.    On February 24, 2022, the Company announced its fourth quarter 2021 financial results in the following chart:

*$ in thousands (unaudited)*

|  | Three months ended December 31, | | | % Change |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | $ Change | |
| Revenue | $ 14,522 | $ 7,488 | $ 7,034 | 94% |
| Cost of revenue | $ 18,481 | $ 7,848 | $ 10,633 | 135% |
| Operating expenses | $ 57,059 | $ 15,535 | $ 41,524 | 267% |
| Other income (expense) (1) | $ 7,110 | $ (3,298) | $ 10,408 | 316% |
| GAAP net loss | $(53,908) | $(19,193) | $(34,715) | (181%) |

143.    During an earnings conference call with investors and analysts to discuss these results, Defendant Schoenfelder represented that it was "another strong quarter for Latch" and that, as a result of taking the company public earlier in the year and "strong growth," the Company had a 129% increase in total revenue for Full Year 2021.[9]

***March 1, 2022 Form 10-K***

144.    On March 1, 2022, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2021 (the "2021 10-K"), which was signed by Defendants Schoenfelder, Mitchell, Campbell, Han, Rishi, Smith, Speyer, and Sugrue. In regard to the Company's revenue recognition policy for hardware, the 2021 10-K stated:

*Hardware and Other Related Revenue*

We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart apartment solutions.

---

[9] https://investors.latch.com/news-releases/news-release-details/latch-reports-fourth-quarter-and-full-year-2021-financial

51

\*     \*     \*

We recognize hardware revenue when the hardware is shipped directly to building developers or to our channel partners, which is when control is transferred to the building developer.

145.    The 2021 10-K also reported the Company's progress with remediation regarding previously disclosed material weaknesses in its internal control over financial reporting:

Management identified material weaknesses in our internal control over financial reporting for the periods ended December 31, 2020 and 2019. The material weaknesses relate to: (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; (c) selection and development of control activities, including over information technology related to certain account balances; and (d) accounting for complex financial instruments (as further described below).

\*     \*     \*

We have implemented substantial remediation efforts as described below. As such, weaknesses (a), (b) and (d) as noted above have been addressed. Remediation efforts are still ongoing for weakness (c) regarding the development and effectiveness of control activities, and we are on target to remediate this material weakness during the year ended December 31, 2022. Remediation efforts to date include the following:

•       We strengthened our compliance and accounting functions with additional experienced hires to address evaluation of technical accounting matters, as well as added headcount to address general segregation of duties. System controls have been implemented, tested and determined to be effective pertaining to review and approval of journal entries. As such, management believes that components (a) and (d) of the material weaknesses identified above have been remediated as of December 31, 2021.

•       We performed a formalized financial and fraud risk assessment and subsequently selected and designed internal control activities, including over information technology. As such, management believes that component (b) of the material weaknesses identified above has been remediated as of December 31, 2021.

•       We performed full-scope testing and assessed the effectiveness of our financial and information technology control activities. While substantial progress was made broadly, further action and additional testing in certain areas is required before we can conclude full remediation.

•       We continue to be engaged with external consultants with public company and technical accounting experience to facilitate accurate and timely accounting closes and to accurately prepare and review the financial statements and related footnote disclosures. We plan to retain these financial consultants, as needed, until

52

such time that the required financial controls have been fully implemented.

146.    The above statements identified in ¶¶ 142-145 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

### *March 18, 2022 Prospectus*

147.    On March 18, 2022, the Company filed a third prospectus with the SEC on Form 424b3 (the "Third Prospectus"). In regard to the Company's revenue recognition policy for hardware, the Third Prospectus stated:

*Hardware and Other Related Revenue*

We generate hardware revenue primarily from the sale of our portfolio of both first-party and third-party devices for our smart access and smart building solutions.

\*          \*          \*

We recognize hardware revenue when the hardware is shipped directly to building developers or to our channel partners, which is when control is transferred to the building developer.

\*          \*          \*

We continue to see the impact of labor and building material shortages and construction delays. We continue to confront production issues due to industry-wide supply chain disruptions that created shortages of certain construction materials and other products, and our customers also experienced trade labor availability constraints and delays.

These factors continue to create construction delays for our customers, which have and may continue to delay the timing of our hardware revenue. In addition, we are experiencing higher inventory costs as a result of the global supply chain shortages, which we will continue to incur where economically reasonable in order to prioritize and meet customer demand.

148.    The Third Prospectus also reported the Company's progress with remediation

regarding previously disclosed material weaknesses in its internal control over financial reporting:

For the periods ended December 31, 2020 and 2019, management identified material weaknesses in its internal control over financial reporting, which relate to: (a) our general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; (c) selection and development of control activities, including over information technology related to certain account balances; and (d) accounting for complex financial instruments (as further described in the paragraph below).

On April 12, 2021, the Staff of the SEC issued a statement regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")" (the "SEC Statement").

Following issuance of the SEC Statement, on April 29, 2021, TSIA concluded that it was appropriate to restate the previously issued audited financial statements as of and for the period ended December 31, 2020, and as part of such process, TSIA identified a material weakness in its internal controls over financial reporting.

*        *        *

While we have implemented remediation efforts which address weaknesses (a), (b) and (d) as of December 31, 2021, we cannot assure you that the steps we have taken or will take to remediate any material weakness will be successful, which could impair our ability to accurately and timely meet our public company reporting requirements.

While we have undertaken efforts to improve our control environment, further action and additional testing in certain areas related to material weakness (c) is required before we can conclude full remediation.

54

If we identify any new material weaknesses in the future, any such newly identified material weakness could limit our ability to prevent or detect a misstatement of our accounts or disclosures that could result in a material misstatement of our annual or interim financial statements.

In addition, if we are unable to assert that our internal control over financial reporting is effective or if our independent registered public accounting firm is unable to express an unqualified opinion as to the effectiveness of our internal control over financial reporting, we may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable stock exchange listing requirements, investors may lose confidence in our financial reporting and our stock price may decline as a result.

We cannot assure you that the measures we have taken to date, or any measures we may take in the future, will be sufficient to avoid potential future material weaknesses.

### *April 28, 2022 Proxy Statement*

149.    On April 28, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Schoenfelder, Campbell, Han, Rishi, Smith, Speyer, and Sugrue solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

150.    The 2022 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Rishi and Smith to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent auditor for 2022.

151.    The 2022 Proxy Statement said the following regarding the Board's risk oversight function on page 14:

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2022 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

The Audit Committee is responsible for discussing our policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which Latch's exposure to risk is handled. In accordance with those policies, the Board and its committees have an active role in overseeing management of our risks. The Board regularly reviews information regarding our credit, liquidity, and operations, as well as the risks associated with each. The Compensation Committee is responsible for overseeing the management of risks relating to executive compensation plans and arrangements. The Audit Committee oversees management of financial and cybersecurity risks and potential conflicts of interest. The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

We have established a Management Risk Committee, meeting quarterly and reporting regularly to the Audit Committee, to provide additional oversight of our enterprise risk management function. The Management Risk Committee is comprised of our Interim Chief Financial Officer, Chief Technology Officer, Chief Operating Officer, General Counsel, Senior Vice President of People and Director of Internal Audit. The Management Risk Committee is tasked with (i) meeting with senior employees to identify material risks, (ii) categorizing and ranking risks by significance, (iii) working with management to establish and implement remediation plans for top risks, and (v) regularly reporting to the Audit Committee on all of the above. Under the Audit Committee's oversight, management has also established a formal enterprise risk management charter.

152.    The 2022 Proxy Statement further provided the Audit Committee's responsibilities, listing:

● appointing, compensating, retaining, evaluating, terminating, and overseeing our independent registered public accounting firm;
● discussing with our independent registered public accounting firm their independence from management;
● reviewing with our independent registered public accounting firm the scope and results of their audit;
● approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;
● overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the quarterly and annual financial statements that we file with the SEC;
● overseeing our financial and accounting controls and compliance with legal and regulatory requirements;
● reviewing our policies on risk assessment and risk management;
● reviewing related person transactions; and

● establishing and maintaining procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls, or auditing matters.

153. The 2022 Proxy Statement was materially false and misleading because it failed to disclose that contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

154. The 2022 Proxy Statement also failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022.

155. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders, *inter alia*, elected Defendants Rishi and Smith to the board, allowing them to continue breaching their fiduciary duties.

***May 5, 2022 Press Release***

156. On May 5, 2022, the Company announced its first quarter 2022 financial results, stating:

**Key Business Metrics and Select Financial Metrics**

- **Software Revenue**: Software revenue for the three months ended March 31, 2022 was $3.0 million, up 88% compared to $1.6 million for the same

57

period in 2021.

- **Total Revenue**: Total revenue for the three months ended March 31, 2022 was $13.7 million, up 106% compared to $6.6 million for the same period in 2021.

- **ARR**: ARR for the three months ended March 31, 2022 was $7.9 million, up 137% compared to $3.3 million for the same period in 2021.

- **Spaces**: Spaces for the three months ended March 31, 2022 was 126,746, up 129% compared to 55,305 for the same period in 2021.

- **Net Loss**: Net loss for the three months ended March 31, 2022 was $44.2 million, up 16% compared to $38.1 million during the same period in 2021.

- **Adjusted EBITDA**: Adjusted EBITDA for the three months ended March 31, 2022 was $(36.8) million, down 165% compared to $(13.9) million during the same period in 2021. Please see below for a reconciliation of Adjusted EBITDA to our closest GAAP metric, net loss, as well as a discussion of why we view Adjusted EBITDA as an important metric.

157.    Regarding these results, Defendant Schoenfelder stated that "demand for Latch-enabled spaces continues to grow among multifamily real estate owners, operators, and developers, and is reflected in [Latch's] strong first quarter performance."[11]

***May 5, 2022 Form 10-Q***

158.    That same day, May 5, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2022 (the "1Q 2022 10-Q"), which was signed by Defendants Schoenfelder and Schaeffer. The 1Q 2022 10-Q revealed that the previously disclosed material weaknesses in the Company's internal control over financial reporting had not been remediated. The Company stated the following regarding its policy for revenue recognition:

> The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions. The Company sells

---

[11] https://investors.latch.com/news-releases/news-release-details/latch-reports-first-quarter-2022-financial-results

hardware to building developers directly or through its channel partners who act as the intermediary and installer.  The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

***May 9, 2022 Prospectus Supplement***

159.    On May 9, 2022, the Company filed a prospectus supplement with the SEC on Form 424b3 (the "Third Supplement") that contained false and misleading statements. The Third Supplement stated the following regarding Latch's internal control over financial reporting:

> Management identified a material weakness in our internal control over financial reporting for the periods ended December 31, 2020 and 2019. The material weakness relates to selection and development of control activities, including over information technology related to certain account balances. Management has concluded that this material weakness in internal control over financial reporting was due to the fact that we were a private company with limited resources and did not have the necessary business processes and related internal controls formally designed and implemented, coupled with the appropriate resources with the appropriate level of experience and technical expertise, to oversee our business processes and controls. As of December 31, 2021, the material weakness had not been remediated.
>
> Our management, with the participation of our Chief Executive Officer and Interim Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Report. In making this evaluation, management considered the material weakness in our internal controls over financial reporting described above. Based on such evaluation, our Chief Executive Officer and Interim Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures were not effective.
>
> We have implemented substantial remediation efforts as described below. Remediation efforts are still ongoing regarding the development and effectiveness of control activities, and we remain on target to remediate this material weakness during the year ended December 31, 2022. Remediation efforts to date include the following:
> •We performed full-scope testing and assessed the effectiveness of our financial and information technology control activities. While substantial progress was made broadly, further action and additional testing in certain areas is required before we can conclude full remediation.

•We continue to be engaged with external consultants with public company and technical accounting experience to facilitate accurate and timely accounting closes and to accurately prepare and review the financial statements and related footnote disclosures. We plan to retain these financial consultants, as needed, until such time that the required financial controls have been fully implemented.

The actions that have been taken are subject to continued review and testing by management, as well as oversight by the audit committee of our board of directors. While we have implemented a variety of steps to remediate this weakness, we cannot assure you that we will be able to fully remediate it, which could impair our ability to accurately and timely meet our public company reporting requirements.

Notwithstanding the assessment that our internal controls over financial reporting are not effective and that a material weakness exists, we believe that we have employed supplementary procedures to ensure that the financial statements contained in this Report fairly present our financial position, results of operations and cash flows for the reporting periods covered herein in all material respects.

160.    In regard to the Company's revenue recognition policy for hardware, the Third Supplement stated:

*Hardware*
The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions.

*        *        *

The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

161.    The statements in paragraphs ¶¶ 156-160 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements

60

for fiscal 2021 and first quarter 2022. As a result of the foregoing, the Company's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### *August 10, 2022 Notice of Inability to Timely File Form 10-Q*

162.    On August 10, 2022, the Company filed a notice of inability to timely file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2022 because of an internal investigation into the Company's practices for recognizing revenue. The Company stated:

> The Company is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 (the "Quarterly Report") without unreasonable effort or expense within the prescribed time period. The Audit Committee of the Company's Board of Directors has commenced an investigation (the "Investigation") of alleged current and prior period matters that include, but may not be limited to, certain aspects of the Company's current and historic key performance indicators and revenue recognition practices, including the accounting treatment, financial reporting and internal controls related thereto. As the Investigation includes matters related to accounting for the quarter ended June 30, 2022, the Company is unable to file the Quarterly Report at this time.

### The Truth Fully Emerges

163.    On August 25, 2022, the Company announced that, because of revenue recognition errors related to hardware device sales, it would restate financial statements for 2021 and the first quarter of 2022. The Company stated that "certain revenue recognition errors occurred as a result of unreported sales arrangements" because there was "sales activity that was inconsistent with the Company's internal controls and procedures."

164.    That same day, the Company filed a Form 8-K with the SEC, stating:

> The Audit Committee has commenced an investigation of possible current and prior period matters that include certain aspects of the Company's current and historic key performance indicators and revenue recognition practices, including the accounting treatment, financial reporting and internal controls related thereto.

61

While the Investigation is ongoing, on August 19, 2022, based on the preliminary findings of the Investigation, the Audit Committee determined that the Company's consolidated financial statements for 2021 included in the Company's Annual Report on Form 10-K for the year ended December 31, 2021 and associated report of the Company's independent registered public accounting firm, Deloitte & Touche LLP ("Deloitte"), *as well as the Company's consolidated financial statements for the first quarter of 2022 included in the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2022, should no longer be relied upon as a result of material errors and possible irregularities relating to, among other things, the manner in which the Company recognized revenue associated with the sale of hardware devices during 2021 and the first quarter of 2022.* Accordingly, the Audit Committee, in consultation with the Company's management, has determined that the Company's consolidated financial statements for 2021 and the first quarter of 2022 will be restated.

Based on the preliminary findings of the Investigation, *certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures.* The Company's management is assessing the effect of the matters identified to date and the restatement on the Company's internal control over financial reporting and its disclosure controls and procedures. Although the assessment is not yet complete, the review is likely to result in one or more material weaknesses in the Company's internal control over financial reporting during the applicable periods.

While the Audit Committee believes the errors identified to date affect only the 2021 and first quarter 2022 consolidated financial statements based on the preliminary findings of the Investigation, the Investigation remains ongoing, and it is possible that the Audit Committee, in consultation with the Company's management, will determine that additional errors, including errors that may affect additional periods, could be identified. As a result, the Audit Committee has not determined whether financial statements for any other periods include errors or possible irregularities or the amounts of any required adjustments to the Company's previously reported financial statements for such periods. Following the completion of the Investigation, the Company will file amended periodic reports for any periods requiring restatement.

(Emphasis added.)

146.    On this news, the price per share of the Company's common stock fell $0.13, or 12.2%, to close August 26, 2022 at $0.95.

**DAMAGES TO LATCH**

62

147.    As a direct and proximate result of the Individual Defendants' misconduct, Latch has lost and will continue to lose and expend many millions of dollars.

148.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and Defendants Schoenfelder, Mitchell, and Schaeffer, the Audit Committee's Investigation, and the restatement, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

149.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

150.    As a direct and proximate result of the Individual Defendants' conduct, Latch has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

151.    Plaintiff brings this action derivatively and for the benefit of Latch to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Latch, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

152.    Latch is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

153.    Plaintiff is, and has been at all relevant times, a shareholder of Latch. Plaintiff will adequately and fairly represent the interests of Latch in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

154.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

155.    A pre-suit demand on the Board of Latch is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Rishi, Smith, Campbell, Han, Speyer, and Sugrue (the "Director Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director Defendants who are on the Board at the time this action is commenced.

156.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

157.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing,

64

the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

158.    Additional reasons that demand is futile on Defendant Rishi follow. As a Company director, Defendant Rishi is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2021 10-K, which each contained false and misleading statements. In addition, the 2022 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rishi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand is futile on Defendant Smith follow. As a Company director, Defendant Smith is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2021 10-K, which each contained false and misleading statements. In addition, the 2022 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Smith breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand is futile on Defendant Campbell follow. As a Company director, Defendant Campbell is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2021 10-K, which each contained false and misleading statements. In addition, the 2022 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Campbell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161. Additional reasons that demand is futile on Defendant Han follow. As a Company director, Defendant Han is entitled to significant compensation. She signed, or had signed on her behalf, the Registration Statement, the amended Registration Statement, and the 2021 10-K, which each contained false and misleading statements. In addition, the 2022 Proxy Statement was solicited on her behalf and contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Han breached her fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162.    Additional reasons that demand is futile on Defendant Sugrue follow. As a Company director, Defendant Sugrue is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2021 10-K, which each contained false and misleading statements. In addition, the 2022 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sugrue breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand is futile on Defendant Speyer follow. As a Company director, Defendant Speyer is entitled to significant compensation. His insider sales before the fraud was exposed demonstrate his motive in facilitating and participating in the fraud. His large Company stock holding (considered collectively with the Sponsor), worth $129 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2021 10-K, which each contained false and misleading statements. In addition, the 2022 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the

67

scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Speyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164. Additional reasons that demand on the Board is futile follow.

146. During the year ended December 31, 2021, the Company sold hardware and software in the ordinary course of business to properties owned by affiliates of Tishman Speyer for approximately $0.1 million. Defendant Speyer is President and CEO of Tishman Speyer. Tishman Speyer has done substantial business with Latch, making Defendant Speyer a party to numerous related party transactions. The history of, and prospect of doing more, business between the two companies renders Defendant Speyer unable to disinterestedly and independently consider commencing litigation against himself and the other Individual Defendants.

147. Defendants Rishi, Smith, and Campbell (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for assisting the Board of Directors of the Company in: (a) its oversight and monitoring of: (i) the integrity of the Company's financial statements and other financial information provided by the Company to its stockholders and others; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function and the performance of the internal audit function after it has been established, and (b)

preparing the Committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

148.    The Audit Committee Defendants failed to monitor the integrity of the Company's internal controls, allowing the materially misleading financial statements to be disseminated in the Company's SEC filings and other disclosures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

149.    Latch has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Latch any part of the damages Latch suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

150.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Latch's officers and directors, and these acts are incapable of ratification.

152.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Latch. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Latch, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Latch to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least three of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

157.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

158.    Under the direction and watch of the Director Defendants, the 2022 Proxy Statement failed to disclose that contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements.

165.    The 2022 Proxy Statement also failed to disclose that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal

71

control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result, the 2022 Proxy Statement was materially false and misleading.

159. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of Defendants Rishi and Smith.

160. The false and misleading elements of the 2022 Proxy Statement led to, among other things, the election of Defendants Rishi and Smith, which allowed them to continue to breach their fiduciary duties to Latch.

161. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

162. Plaintiff, on behalf of Latch, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

163. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Latch's business and affairs.

72

165.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

166.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Latch.

166.    In breach of their fiduciary duties owed to Latch, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) in relation to hardware devices, there were unreported sales arrangements; (2) because of this, throughout fiscal 2021 and first quarter 2022, the Company had improperly recognized revenue; (3) the Company's internal control over financial reporting related to revenue recognition contained material weaknesses; and (4) due to the foregoing, the Company was required to restate financial statements for fiscal 2021 and first quarter 2022. As a result of the foregoing, Latch's public statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

167.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

168.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Latch's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Latch has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.     Plaintiff on behalf of Latch has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

173.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74

174.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Latch.

175.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Latch that was tied to the performance or artificially inflated valuation of Latch, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

176.    Plaintiff, as a shareholder and a representative of Latch, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

177.     Plaintiff on behalf of Latch has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Abuse of Control**

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Latch, for which they are legally responsible.

180.    As a direct and proximate result of the Individual Defendants' abuse of control, Latch has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff on behalf of Latch has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

182.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Latch in a manner consistent with the operations of a publicly-held corporation.

184.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Latch has sustained and will continue to sustain significant damages.

185.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of Latch has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

189.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Latch to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

190.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

191.    Plaintiff on behalf of Latch has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendants Schoenfelder, Mitchell, and Schaeffer for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    Latch, Defendant Schoenfelder, Defendant Mitchell, and Defendant Schaeffer are named as defendants in the New York Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Additionally, Defendant Schoenfelder is named as a defendant in the Delaware Securities Class Action which asserts claims under the federal securities laws for violations of Sections 11 and 15. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schoenfelder's, Mitchell's, and Schaeffer's willful and/or reckless violations of their obligations as officers and/or directors of Latch.

194.    Defendants Schoenfelder, Mitchell, and Schaeffer, because of their positions of control and authority as CEO and CFO of Latch, respectively, were able to and did, directly and/or

77

indirectly, exercise control over the business and corporate affairs of Latch, including the wrongful acts complained of herein and in the Securities Class Action.

195.    Accordingly, Defendants Schoenfelder, Mitchell, and Schaeffer are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196.    As such, Latch is entitled to receive all appropriate contribution or indemnification from Defendants Schoenfelder, Mitchell, and Schaeffer.

## EIGHTH CLAIM
**Against Defendants Schoenfelder, Campbell, Han, Rishi, Speyer, and Sugrue for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act**

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Latch shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 of the Securities Act and Section 15 of the Exchange Act.

148.    Federal law provides Latch with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

149.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's Offering contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

150.    Latch is the registrant for the Offering. Defendants Schoenfelder, Campbell, Han, Rishi, Speyer, and Sugrue were responsible for the contents and dissemination of the Registration Statement.

151.    As issuer of the shares, Latch is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

152.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

153.    Defendants Schoenfelder, Campbell, Han, Rishi, Speyer, and Sugrue because of their positions of control and authority as controlling shareholders, officers and/or directors of Latch, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Latch, including the wrongful acts complained of herein and in the Securities Class Action.

154.    Accordingly,  Defendants Schoenfelder, Campbell, Han, Rishi, Speyer, and Sugrue are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

155.    As such, Latch is entitled to receive all appropriate contribution or indemnification from Defendants Schoenfelder, Campbell, Han, Rishi, Speyer, and Sugrue.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Latch, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Latch;

(c)    Determining and awarding to Latch the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Latch and the Individual Defendants to take all necessary actions to reform and improve Latch's corporate governance and internal procedures to comply with applicable laws and to protect Latch and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Latch to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)      Awarding Latch restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 13, 2023

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
      shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I,    In Daniel Gottlieb  am  a        plaintiff    in    the within action. I have  reviewed  the  allegations  made  in  this  shareholder  derivative complaint, know  the  contents  thereof,  and  authorize  its  filing.  To those allegations of which   I have  personal  knowledge,  I  believe  those   allegations to be true.  As to those allegations  of which  I  do  not  have personal knowledge, I rely  upon  my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 7/13/2023_____, 2023.

DocuSigned by:

8F80F06FB8C643C...

Daniel Gottlieb